# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### GAINESVILLE DIVISION

| | | |
|---|---|---|
| JOHN MICHAEL GOWDER, | : | MOTION TO VACATE |
| BOP Reg. No. 71566019, | : | 28 U.S.C. § 2255 |
|     Movant, | : | |
| | : | CRIMINAL ACTION NO. |
|     v. | : | 2:18-CR-0009-RWS-JCF-1 |
| | : | |
| UNITED STATES OF AMERICA, | : | CIVIL ACTION NO. |
|     Respondent. | : | 2:21-CV-0080-RWS-JCF |

## ORDER AND NON-FINAL REPORT AND RECOMMENDATION

Movant John Michael Gowder, a federal supervised releasee,[1] has filed a *pro se* 28 U.S.C. § 2255 motion to vacate challenging his 2020 convictions and sentences in this Court for 75 counts of aiding and abetting the dispensing of controlled substances outside the scope of professional practice, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) ("Counts 2-76"), and 27 counts of acquiring controlled substances by deception, in violation of 21 U.S.C. §§ 843(a)(3) and 846 ("Counts 77, 80, 82, 85, 88, 91, 93, 96, 99, 102, 105, 108, 111, 114, 117, 120, 122, 125, 127, 129, 132, 135, 138, 141, 144, 146, 149"). (Doc. 240 at 3.) The matter is

---

[1] A defendant serving a term of supervised release is "in custody" within the meaning of § 2255. <u>Jones v. United States</u>, 478 F. App'x 536, 539 (11th Cir. 2011).

before the Court on the § 2255 motion and the government's response.  Also before the Court is Movant's motion for leave to amend the § 2255 motion.  For the reasons stated below, the motion to amend is **DENIED** because the proposed amended claim is untimely and procedurally barred.  **IT IS RECOMMENDED** that the § 2255 motion be **DENIED IN PART** as to Grounds 1, 2, and 4, and that no certificate of appealability issue.  The government is **DIRECTED** to file a supplemental response to Ground 3 of the § 2255 motion within **TWENTY-ONE (21) DAYS** of the date of this Order as directed further below.

## I.   PROCEDURAL HISTORY

A federal grand jury returned a 213-count second superseding indictment against Movant and his codefendant Dr. James Heaton, charging Movant with 150 counts of violating of the Controlled Substances Act.   (See doc. 77 at 1-16.) Specifically, the indictment alleged a conspiracy between Movant, a hospital administrator, and Dr. Heaton, a physician, to distribute oxycodone outside the scope of professional practice and to acquire controlled substances by deception.  (See id.) The indictment also charged the underlying substantive offenses based on dozens of medically illegitimate oxycodone prescriptions written by Dr. Heaton for Movant and filled by Movant between May 2013 and June 2015.  (Id.)

2

Prior to trial, Movant's counsel moved to sever his trial from Dr. Heaton's, and the District Court denied his motion.  (Docs. 30, 107, 119.)  Ultimately, Movant proceeded to an eight-day joint jury trial with Dr. Heaton.  (Docs. 134-40.)   In Dr. Heaton's appeal, the Eleventh Circuit described the evidence adduced at trial, relevant to Movant, as follows.

> In the late 1990s, Heaton operated a general family practice and rented space to other doctors.  In 2011 or 2012, Heaton moved his practice into a smaller office, where he saw an increasing number of younger patients and patients with chronic pain issues.

> As part of his practice, Heaton operated a sleep study business. Heaton rented the building for his practice from the Union General Hospital (the "Hospital").  Heaton also served as the medical director of the Hospital's nursing home.

> […]

> In 2010, Heaton had a matter before the Medical Board.  In connection with that matter, Heaton provided the Medical Board with two forms that he reportedly gave to patients who were prescribed controlled substances for pain.  Heaton informed the Medical Board that all of the pain patients at his clinic were required to fill out both forms.

> Heaton's form contracts provided that patients agreed: (1) not to ask for prescriptions to be filled early, (2) not to ask for the dosage or frequency of medications to be increased, and (3) that any breach of the contract could result in the patient's dismissal from Heaton's practice. Heaton's records for Gowder […] did not contain these contracts.

> […]

3

Gowder, Heaton's codefendant, had been Heaton's patient since the 1990s. While Gowder testified in his defense case, the government's evidence about Heaton's controlled substance prescriptions for Gowder, recounted below, came from other witnesses, patients' files, medical records, and the database records of the prescription drug monitoring program ("PDMP").

Starting in January 2012, Heaton prescribed Gowder 40 pills of hydrocodone 10 milligrams (mg) to treat Gowder's back and leg pain.

As outlined in detail later, the dosage, quantity, and potency of Gowder's pain prescriptions increased over time. By June 2012, Heaton had increased Gowder's monthly prescription to 120 pills of oxycodone 30 mg. From July 2012 to November 2012, Heaton prescribed Gowder two prescriptions per month, each for 120 or 150 pills of hydrocodone 10 mg or oxycodone 30 mg. By 2013, Heaton was writing Gowder two or three prescriptions, each for 150 pills of oxycodone, nearly every month.

Gowder filled these prescriptions at pharmacies in Georgia, Tennessee, and North Carolina.

On January 1, 2013, Gowder, who was a health care administrator, became the Hospital's chief executive officer ("CEO"). That same day, Gowder increased Heaton's salary as medical director of the Hospital's nursing home by $1,000 a month. A Hospital employee testified that he saw Heaton at the nursing home "very infrequently."

Nearly every month between May 2013 and June 2015, Heaton wrote Gowder two prescriptions, each for oxycodone 30 mg. During that time period, Heaton also wrote Gowder a prescription for Percocet 10 mg most months. For example, in January 2014, Heaton issued Gowder: (1) a prescription for 150 pills of oxycodone 30 mg on January 14th; and (2) prescriptions for 150 pills of oxycodone 30 mg and 150 pills of Percocet 10 mg on January 24th. In total, Heaton prescribed

4

more than 15,000 pain pills to Gowder between January 2012 and June 2015.

Lisa Kelley worked at Heaton's office from the late 1990s to 2015. Kelley testified that, to her knowledge, Gowder never paid for an office visit with Heaton.  Kelley never collected a co-pay from Gowder, who did not make an appointment when he visited Heaton's office.

Instead, at least once a month, Gowder came through the back door of Heaton's clinic at closing time and met with Heaton in his private office to pick up a prescription.  On some of these visits, Gowder brought a check from the Hospital payable to Heaton, who deposited these checks in his personal account.  From April 2013 to December 2015, while Gowder was the CEO, the Hospital issued checks totaling $342,500 to Heaton, some of which Gowder delivered personally.

In January 2014, Gowder, in his capacity as the Hospital's CEO, purchased Heaton's sleep clinic for $155,000.  After this deal, Gowder instructed Hospital employees to reduce Heaton's $3,200 monthly rent for his office space by $1,000 because the sleep study was being housed there.

[…]

In July 2015, Drug Enforcement Administration ("DEA") Agent Jason Allen began to investigate suspected drug diversion in Blairsville, Georgia after Dr. George David Gowder was arrested trying to fill fraudulent prescriptions.  George David Gowder is the brother of Heaton's codefendant Michael Gowder, the Hospital's CEO.  Agent Allen began to investigate Heaton after learning that Heaton issued Michael Gowder numerous prescriptions for oxycodone 30 mg.

In September 2015, Agent Allen and a Medical Board investigator met with Heaton.  At this meeting, the Medical Board investigator subpoenaed Heaton's patient file for Michael Gowder.

Agent Allen, who reviewed this patient file, stated that it was "very light" compared to a typical patient file.

A few weeks later, Agent Allen served a DEA subpoena on Heaton for this same Michael Gowder file, which now contained two MRI reports from 2011 and 2015 and a radiology report from 2006. Agent Allen did not see any of these reports in this file when Heaton provided it to the Medical Board.

[…]

During Heaton and Michael Gowder's eight-day jury trial, the government presented thirteen witnesses and overwhelming evidence of Heaton's unlawful dispensation of controlled substances.  The government's witnesses included former employees of Heaton's practice and the Hospital, Agent Allen, two Medical Board investigators, three of Heaton's patients (T.G., H.J.W., and H.B.W.), and an expert witness on pain management.  The evidence also included hundreds of pages of patient files, medical records, prescription documents, charts from the PDMP databases, and photographs.

[…]

The government called Dr. Gary Kaufman as an expert witness. Dr. Kaufman, a board-certified physician in pain medicine and neurosurgery, ran a pain management clinic in Brunswick, Georgia for thirteen years.  He reviewed the patient files and PDMP records for eleven of Heaton's patients, including Michael Gowder [….] Dr. Kaufman described the Medical Board's rules governing the prescription of controlled substances and explained how Heaton did not follow them.

[…]

Based on his review of Heaton's patient files for Michael Gowder, T.G., and H.J.W., Dr. Kaufman testified that Heaton regularly: (1) failed

6

to conduct credible physical examinations; (2) did not monitor patient compliance with prescribed medications; (3) did not review PDMP records; (4) did not obtain prior medical records relating to pain complaints; and (5) did not properly document the prescriptions that he issued to these patients.

According to Dr. Kaufman, the physical exams documented in Heaton's files were not "authentic" because (1) Heaton repeatedly failed to fill out important blanks in the electronic template, and (2) Heaton copied and pasted the same information on the templates for the completed parts of the template, even though that information likely would have changed from visit to visit. Ultimately, after reviewing all of the patient files and prescriptions, Dr. Kaufman opined that Heaton prescribed pain medications to Michael Gowder, T.G., and H.J.W. without a legitimate medical purpose and outside the usual course of professional practice.

[…]

Even though Heaton wrote more than 100 prescriptions for Michael Gowder, Heaton's patient file for Gowder usually did not document those prescriptions with any notation in the file about what he had prescribed. Heaton's records for Gowder accounted for only five of these prescriptions.

Dr. Kaufman explained that more than 100 prescriptions to Michael Gowder were missing from Heaton's records. Significantly too, apart from two MRI reports, Heaton's patient file for Gowder did not contain prior records of Gowder's pain complaints or indicate that Heaton attempted to get those records.

The PDMP records showed that Heaton prescribed hydrocodone 10 mg to Gowder for six months from January 2012 to June 2012. However, the first note in Heaton's file for Gowder relating to controlled substances was dated June 12, 2012. In this June 12, 2012, note, Heaton wrote that he planned to prescribe Gowder 120 pills of oxycodone 30

7

mg to treat Gowder's back pain.  While Dr. Kaufman did not doubt Gowder was experiencing back pain from his previous back surgery, Dr. Kaufman testified that this pain did not provide Heaton with a legitimate medical reason to be prescribing 120 pills of oxycodone 30 mg.

In July and August 2012, Heaton continued to issue the same prescription for 120 pills of oxycodone 30 mg to Gowder without noting in Gowder's file that he had collected Gowder's medical history, conducted a physical exam, or monitored Gowder's compliance with the prescribed medications.  From September to December 2012, Heaton wrote Gowder monthly prescriptions for 120 pills and then 150 pills of oxycodone 30 mg.

In sum, in 2012, Heaton increased the dosage, strength, and quantity of Gowder's monthly medications from 40 pills of hydrocodone 10 mg in January 2012 to 150 pills of oxycodone 30 mg in December 2012, without documenting why he was increasing Gowder's medications.  Heaton also routinely prescribed "extra" or early prescriptions to Gowder for a 30-day supply of 120 or 150 pills of oxycodone 30 mg roughly every 2 weeks.

In January 2013, Heaton also started to issue Gowder prescriptions for 150 pills of Percocet 10 mg.  Heaton noted that he was prescribing Percocet to treat Gowder's "breakthrough pain."  Dr. Kaufman, however, testified that (1) Percocet can treat "breakthrough pain" that arises when a long-acting medication wears off too soon, but (2) oxycodone 30 mg was not a long-acting medication, so Gowder did not need a prescription for breakthrough pain.

By May 2013, Heaton each month was prescribing Gowder two prescriptions, each for 150 pills of oxycodone 30 mg, and one prescription for 150 pills of Percocet 10 mg.  Dr. Kaufman explained that Heaton in effect was prescribing Gowder the equivalent of a daily dose of 450 milligram morphine, or a milligram morphine equivalent ("MME") of 450.  Under these circumstances, Dr. Kaufman would have

suspected that Gowder was a drug addict or was diverting his medication.

On June 13, 2013, Heaton noted in the file that he had prescribed 120 pills of oxycodone 30 mg to Gowder. The PDMP records, however, showed that since January 2013 Heaton had written Gowder multiple prescriptions, each for 150 pills of oxycodone 30 mg.

In 2014, Heaton documented only one office visit for Gowder, despite the Medical Board's requirement to see a patient who is taking opioids once every three months. Dr. Kaufman testified that Heaton's note for that one 2014 visit was "deceptive" because Heaton indicated he was treating Gowder using "conservative measures" without acknowledging the extensive pain medication being prescribed to Gowder.

From June 18, 2014, to July 16, 2014, Heaton issued Gowder three oxycodone prescriptions, each for 150 pills of oxycodone 30 mg, and one prescription for 150 pills of Percocet 10 mg. In effect, Heaton was prescribing Gowder the equivalent of 885 MME per day, a "very high" daily dose that would kill the average person, but that an addicted person might be able to consume. Dr. Kaufman testified that: (1) it was generally recommended that physicians in general practice not prescribe more than 50 or 100 MME per day; and (2) Dr. Kaufman had never prescribed a patient more than 500 MME a day and only prescribed 250 MME to 5 or 10 patients in his entire career.

Dr. Kaufman also reviewed records from Gowder's visits with two specialists in 2015. During a visit with a cardiologist in June 2015, Gowder reported "some increasing low back pain" over the past three to four months. In December 2015, Gowder saw a neurologist and reported numbness and moderate-to-severe pain. Dr. Kaufman explained that this amount of pain would not have warranted the pain medications that Heaton prescribed to Gowder.

[…]

9

Michael Gowder testified in his own defense that, despite some compliance issues, the sleep clinic became profitable the year after the Hospital purchased it from Heaton.

United States v. Heaton, 59 F.4th 1226, 1229-38 (11th Cir. 2023).

At the close of the government's case-in-chief, Movant's counsel orally moved for judgment of acquittal on all counts and the District Court denied the motion. (See doc. 139.) The jury acquitted Movant of conspiring to distribute and obtain prescription drugs outside the usual course of medical practice and for no legitimate medical purpose ("Count 1"), but convicted him of 75 counts of aiding and abetting dispensing of controlled substances outside the scope of professional practice ("Counts 2-76") and 27 counts of acquiring controlled substances by deception ("Counts 77, 80, 82, 85, 88, 91, 93, 96, 99, 102, 105, 108, 111, 114, 117, 120, 122, 125, 127, 129, 132, 135, 138, 141, 144, 146, 149").[2] (Doc. 143 at 1-19.)

After trial, Movant's counsel filed a motion for new trial alleging that the District Court's pretrial denial of severance was in error. (Doc. 131.) The District

---

[2] Counts 78, 79, 81, 83, 84, 86, 87, 89, 90, 92, 94, 95, 97, 98, 100, 101, 103, 104, 106, 107, 109, 110, 112, 113, 115, 116, 118, 119, 121, 123, 124, 126, 128, 130, 131, 133, 134, 136, 137, 139, 140, 142, 143, 145, 147, 148, and 150 were dismissed prior to trial for improper venue. See doc. 119 at 9-12.

Court denied the motion.  (Doc. 177.)  On July 6, 2020, the District Court entered a final judgment sentencing Movant to an aggregate term of imprisonment of one year and one day, to be followed by two years' supervised release.  (Doc. 204 at 3-4.)  The instant § 2255 motion followed.

## II.   <u>MOTION TO AMEND THE § 2255 MOTION</u>

Movant has filed a motion "to allow … an additional argument to his 28 U.S.C. § 2255 motion," in which he seeks leave to amend the § 2255 motion to raise an additional claim that his § 841 convictions must be vacated in light of the Supreme Court's recent decision in <u>Ruan v. United States</u>, 142 S.Ct. 2370 (2022), in which the Supreme Court overturned contrary Eleventh Circuit precedent and held that "[21 U.S.C.] § 841's 'knowingly or intentionally' *mens rea* applies to the 'except as authorized' clause[,] … mean[ing] that once a defendant meets the burden of producing evidence that his or her conduct was 'authorized,' the Government must prove beyond a reasonable doubt that the defendant knowingly or intentionally acted in an unauthorized manner."  <u>Ruan,</u> 142 S.Ct. at 2376.  Movant contends that his § 841 convictions must be vacated because the Government was not required to prove the <u>Ruan</u> *mens rea* element and there was no evidence that he knew that Dr. Heaton's prescriptions were illegitimate.  (Doc. 250 at 1-6, 12-13.)

11

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposes a one-year statute of limitations for filing a § 2255 motion that begins to run from the latest of four triggering dates, including the date on which the judgment of conviction becomes final.  28 U.S.C. § 2255(f)(1).  Here, Movant's convictions became final on July 20, 2020, when the 14-day period for filing a notice of appeal expired.  See Fed. R. App. P. 4(b)(1)(A); Akins v. United States, 204 F.3d 1086, 1089 n.1 (11th Cir. 2000) ("A conviction ordinarily becomes final when the opportunity for direct appeal of the judgment of conviction has been exhausted.").  Movant timely filed his § 2255 motion on April 8, 2021, and the AEDPA statute of limitations expired on July 20, 2021.  Movant filed his motion to amend and proposed amended claim on July 25, 2022, more than a year after the expiration of the AEDPA statute of limitations.  Thus, his proposed amended claim time-barred unless it related back to his initial § 2255 motion under Fed. R. Civ. P. 15(c).

Rule 15(c), provides that "[a]n amendment of a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading."  Fed. R. Civ. P. 15(c)(1)(B).  Additionally, in order to relate back, "[t]he untimely claim must have more in common with the timely filed

claim than the mere fact that they arose out of the same trial and sentencing proceedings. . . .  Instead, . . . the claims must have arisen from the same set of facts as the timely filed claim, not from separate conduct or a separate occurrence in both time and type."  <u>Davenport v. United States</u>, 217 F.3d 1341, 1344 (11th Cir. 2000) (quotation marks omitted).  In other words, "while Rule 15(c) contemplates that parties may correct technical deficiencies or expand facts alleged in the original pleading, it does not permit an entirely different transaction to be alleged by amendment."  <u>Dean v. United States</u>, 278 F.3d 1218, 1221 (11th Cir. 2002).

Here, Movant's proposed new claim does not relate back to his claims of selective prosecution, guilt by association, ineffective assistance of counsel, or the trial court's failure to sever, but instead alleges a separate claim under <u>Ruan</u>. Therefore, Movant's <u>Ruan</u> claim is untimely.  Neither the Supreme Court nor the Eleventh Circuit have indicated that <u>Ruan</u> is retroactively available to cases on collateral review.  <u>See</u> <u>In re Blanc</u>, No. 22-12527-F, 2022 LEXIS 24640, *1–5 (11th Cir. Aug. 31, 2022) (unpublished)

Alternatively, Movant's proposed <u>Ruan</u> claim is procedurally defaulted because Movant failed to raise it on direct appeal.  "[C]ollateral review is not a substitute for a direct appeal . . . ."  <u>Lynn v. United States</u>, 365 F.3d 1225, 1232

(11th Cir. 2004) (per curiam).  "Generally, if a challenge to a conviction or sentence is not made on direct appeal, it will be procedurally barred in a § 2255 challenge." United States v. Montano, 398 F.3d 1276, 1279-80 (11th Cir. 2005) (citing Mills v. United States, 36 F.3d 1052, 1055 (11th Cir. 1994)).  "A ground of error is usually 'available' on direct appeal when its merits can be reviewed without further factual development." Mills, 36 F.3d at 1055.

Procedural default may be excused if the movant establishes one of two exceptions: (1) cause for the default and actual prejudice from the alleged error, or (2) a fundamental miscarriage of justice, covering "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." Id. at 1055-56 (citing Murray v. Carrier, 477 U.S. 478, 496 (1986)). "Cause" requires a showing of some external impediment that prevented a claim from previously being raised.  See Weeks v. Jones, 52 F.3d 1559, 1561 (11th Cir. 1995) (citing McCleskey v. Zant, 499 U.S. 467, 497 (1991)).  To demonstrate prejudice, a movant "must shoulder the burden of showing, not merely that the errors at his trial [or sentencing] created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial [or sentencing] with error of constitutional dimensions." United States v. Frady, 456 U.S. 152, 170 (1982).  As to

14

the exception for actual innocence, "[t]he miscarriage of justice exception … applies to a severely confined category: cases in which new evidence shows 'it is more likely than not that no reasonable juror would have convicted [the petitioner].'" McQuiggin v. Perkins, 569 U.S. 383, 394-95 (2013) (emphasis added).   Moreover, "'actual innocence' means factual innocence, not mere legal insufficiency." Bousley, 523 U.S. at 623-24 (citation omitted).

Assuming *arguendo* that Movant has alleged cause based on his allegations that his attorney's deficient performance prevented him from filing an appeal that he otherwise would have pursued, see Ground 3, *infra*, he has not shown prejudice.   The evidence adduced at trial showed that Dr. Heaton wrote Movant prescriptions for more than 15,000 top-strength oxycodone and hydrocodone pills over three-and-a-half years.   Dr. Heaton repeatedly wrote Movant 30-day prescriptions for five-per-day oxycodone 30mg within days of each other, and, on at least 14 occasions charged in the indictment, Dr. Heaton wrote Movant multiple prescriptions on the same day. Dr. Heaton wrote Movant prescriptions without appointments, after hours, without examining Movant, and without charging Movant for the visits.   Movant directed hundreds of thousands of dollars in financial benefits towards Dr. Heaton during the time that Dr. Heaton was writing him prescriptions for huge quantities of oxycodone.

Movant filled the prescriptions in three different states to avoid detection by state PDMP systems and paid cash for his out-of-state prescriptions. Consequently, the evidence is overwhelming that Movant knew that Dr. Heaton's prescriptions were made outside the scope of professional practice and were medically illegitimate. See Ruan, 142 S.Ct. at 2382 ("The Government, of course, can prove knowledge of a lack of authorization through circumstantial evidence."). For the same reasons, Movant cannot show that he is factually innocent of his § 841 convictions. Cf. McQuiggin, 569 U.S. at 394-95; Schlup v. Delo, 513 U.S. 298, 324, 327 (1995). Accordingly, Movant's motion for leave to amend the § 2255 motion is **DENIED** because the proposed amended claim is time-barred and procedurally defaulted.

## III.   28 U.S.C. § 2255 MOTION

A federal prisoner may file a motion to vacate his sentence "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). "[T]o obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal." United States v. Frady, 456 U.S. 152, 166 (1982) (footnote omitted). An evidentiary hearing is

16

warranted unless "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b).  See also Diaz v. United States, 930 F.2d 832, 834 (11th Cir. 1991) (noting that, although prisoner seeking collateral relief is entitled to evidentiary hearing if relief is warranted by facts he alleges, which court must accept as true, hearing is not required if record conclusively demonstrates that no relief is warranted).

Movant enumerates four grounds for relief in his § 2255 motion:

1. he was selectively prosecuted and/or his trial counsel was ineffective for failing to raise the same;

2. he was found guilty only by association with his codefendant Dr. Heaton and/or his trial counsel was ineffective for failing to raise the same;

3. his trial counsel was ineffective for failing to adequately advise him of his appeal rights and failing to file a notice of appeal; and

4. the trial court erred by failing to sever Movant's trial from codefendant Dr. Heaton's and/or his trial counsel was ineffective for failing to obtain severance.

## A.    Ground 3

Movant alleges that, after the jury verdict, Defendant informed his counsel that he "wished to discuss an appeal," and his counsel told him that "it would require additional money to go further with the case."  As a result, Movant "assumed" that,

because he had limited money, his attorney would go no further with the case, including filing a notice of appeal, and no notice of appeal was filed. (Doc. 240 at 6.) Movant contends that counsel rendered deficient performance by failing to advise him that he had a right to appeal and that he could file a *pro se* notice of appeal "by simple letter to the court." (Id. at 8-9.) Movant asserts that counsel's deficient failure to advise deprived him of an appeal that he otherwise would have taken. (Id.)

Liberally construing Movant's claim as one that his counsel failed to file a notice of appeal despite being explicitly asked to do so, the government states that an evidentiary hearing is necessary to resolve this ground.

The Sixth Amendment right to counsel includes the right to the effective assistance of competent counsel. McMann v. Richardson, 397 U.S. 759, 771 & n.14 (1970). To make a successful claim of ineffective assistance of counsel, a petitioner must show that (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). Counsel's performance is deficient only if it falls below the wide range of competence demanded of attorneys in criminal cases. See Strickland, 466 U.S. at 687-88. Prejudice occurs when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

18

different." Id. at 694.  In the context of an attorney who fails to file a notice of appeal, counsel acts deficiently when he disregards specific instructions from the defendant to file a notice of appeal.  Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000).  However, when a defendant "neither instructs counsel to file an appeal nor asks that an appeal not be taken," the first question to ask is "whether counsel in fact consulted with the defendant about an appeal."  Id. at 478.

The Eleventh Circuit has interpreted Flores-Ortega's definition of "consult" to require counsel to (1) inform the defendant about his right to appeal, (2) advise the defendant about the advantages and disadvantages of pursuing an appeal, and (3) make a reasonable effort to ascertain the defendant's wishes about an appeal, regardless of the merits of an appeal.  Thompson v. United States, 504 F.3d 1203, 1206 (11th Cir. 2007).  The question of what constitutes adequate consultation is one of content, not duration.  Id. at 1207 n.7.  Additionally, that the fact that the sentencing court informed a defendant that he had the right to appeal does not absolve counsel's duty to consult with the defendant about the substance of the right.  Id. at 1208 n.8.  In order to establish that he was prejudiced by counsel's failure to file an appeal, a defendant must show that "there is a reasonable probability that, but for

19

counsel's deficient failure to consult with him about an appeal, he would have timely appealed." Id. at 1207.

Here, Movant does not allege that he ever actually directed counsel to file a notice of appeal.  (See generally doc. 240.)  Rather, Movant alleges that counsel rendered deficient performance by failing to adequately consult with him about his appellate rights, including informing him of his right to appeal and ascertaining whether he wished to appeal.  (See id. at 6, 8-9.)  If movant's allegations are true, counsel's consultation was inadequate.  See Thompson, 504 F.3d at 1206.

The government has not submitted an affidavit or proffered any other evidence indicating whether Movant's trial counsel, Attorney Sadow, would confirm or dispute whether he failed to consult with Movant about his appellate rights as described in the § 2255 motion.  A hearing is necessary only if there is a disputed issue of fact on this point that needs to be resolved.

Accordingly, the government is **DIRECTED** to file a supplemental response to Movant's § 2255 motion within **TWENTY-ONE (21) DAYS** of the date of this Order.  The government must confer with Attorney Sadow and state on the record whether counsel disputes Movant's claim that he failed to consult with him about his appellate rights.  The government may submit an affidavit or declaration from

20

Attorney Sadow demonstrating whether there is a genuine factual dispute requiring an evidentiary hearing.[3]  The undersigned finds that the record is sufficient to resolve the remaining grounds, which are addressed below.

### B.   Grounds 1-2, 4

In Ground 1, Movant alleges that he was selectively prosecuted because his "actions standing alone committed no crime" and that he was "selectively prosecuted solely because of his (association) treatment from Dr. James Heaton." (Doc. 240 at 2, 4.)  Similarly, in Ground 2, Movant states that he was improperly convicted purely "by association" with Dr. Heaton, and that no evidence was adduced at trial that Movant was involved in any illegal purchasing or selling, that he purchased any illegal drugs, that he was involved with Dr. Heaton's violations, or that he did

---

[3] "[A] petitioner waives his attorney-client privilege by injecting into the litigation 'an issue that requires testimony from [his] attorneys or testimony concerning the reasonableness of [his] attorneys' conduct.'" <u>Smith v. United States</u>, No. 4:05-CR-003-14-HLM, 2007 WL 9735818, at *1 (N.D. Ga. Sept. 14, 2007) (citing <u>Johnson v. Ala.</u>, 256 F.3d 1156, 1178 (11th Cir. 2001)).  To that end, counsel (1) may testify to client communications implicated by the § 2255 motion, (2) may provide the government correspondence or other written notes or documentation of client communications implicated by the § 2255 motion, and (3) may discuss the matters implicated by the § 2255 motion with the government beforehand in preparation for any potential evidentiary hearing.

anything other that "follo[w] the orders of his licensed physician."  (Id. at 2, 5.)  In Ground 4, Movant asserts that the trial court erred in denying his motion to sever his trial from Dr. Heaton's because Movant would have been able to call Dr. Heaton to give exculpatory testimony that Movant knew nothing about Dr. Heaton's criminal activities and was not involved in them.  (Id. at 10-12.)  Movant contends that denial of severance under these circumstances was error and denied him a complete defense. (Id.)  In his introduction, Movant states that all "claims fall within ineffective assistance of counsel."  (Id. at 1.)

As discussed in Part II above, a § 2255 motion is not a substitute for direct appeal and claims that could have been raised on appeal are procedurally barred on collateral review absent a showing of cause and prejudice.  See Lynn, 365 F.3d at 1232.  Assuming *arguendo* that Movant has alleged cause based on his allegations that his attorney's deficient performance prevented him from filing an appeal that he otherwise would have pursued, see Ground 3, *supra*, he nevertheless has not shown prejudice with respect to Grounds 1, 2, and 4.

Namely, Movant has not alleged a credible selective prosecution claim, or plausibly alleged that he was convicted based on any improperly admitted guilt-by-association evidence.  Cf. Wayte v. United States, 470 U.S. 598, 608 (1985)

22

(explaining that, to demonstrate selective prosecution in violation of the Equal Protection Clause, a defendant must show both disparate treatment and improper prosecutorial motive "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification") (quotation omitted); United States v. Ocampo-Vergara, 857 F.3d 303, 307-08 (5th Cir. 2017) (noting that evidence is improper where it "indicates *only* that a defendant associates with unsavory characters," but that, "in a conspiracy case, evidence that the defendant was involved with coconspirators is highly relevant," and that no guilt-by-association problems arise where the defendants' offense is connected to others' conduct) (emphasis in original).  Rather, Movant's Grounds 1 and 2 sound in sufficiency of the evidence and reiterate Movant's trial defense that all he did was innocently rely on facially legitimate prescriptions written by his doctor.  As discussed in detail in Section II, *supra*, the evidence that Movant knowingly aided and abetted Dr. Heaton's illegitimate dispensing of controlled substances and deceptively acquired controlled substances was overwhelming based on the sheer number of pills that Dr. Heaton prescribed for Movant over a relatively brief period of time, the highly unusual and incriminating circumstances under which Movant received and filled the prescriptions, the efforts that Movant took to avoid detection of the number of

23

prescriptions that he was filling, and the various financial benefits that Movant directed towards Dr. Heaton while Dr. Heaton was writing him illegitimate prescriptions for huge quantities of high-strength opioids.  Cf. United States v. Feliciano, 761 F.3d 1202, 1206 (11th Cir. 2014) (explaining that a conviction will be upheld unless a rational factfinder could not have found the defendant guilty under any reasonable construction of the evidence").

As to the trial court's denial of severance, "[i]t is well settled that defendants who are indicted together are usually tried together," which is "particularly true in conspiracy cases."  United States v. Browne, 505 F.3d 1229, 1268 (11th Cir. 2007). In denying the motion to sever, the District Judge considered the relevant factors, see United States v. Leavitt, 878 F.2d 1329, 1340 (11th Cir. 1989), and concluded that Movant did not have a bona fide need for Dr. Heaton's testimony because Dr. Heaton's proffered testimony that legitimate medical reasons supported his pain prescriptions to Movant was self-serving and in no way inconsistent with Dr. Heaton's interests.  (Doc. 119 at 4-8.)  Under these circumstances, the District Judge did not abuse his discretion in denying the motion to sever.  See Browne, 505 F.3d at 1269 (affirming denial of motion to sever where codefendant's proffered testimony "was in no way contrary to [testifying co-defendant's] own interests");

24

United States v. Pepe, 747 F.2d 632, 651 (11th Cir.1984) (same).  Consequently, Movant has not shown prejudice to overcome the procedural default of Grounds 1, 2, and 4, and the substantive grounds are barred from § 2255 review.  See Lynn, 365 F.3d at 1232.

To the extent that Grounds 1, 2, and 4 are raised as claims of ineffective assistance of counsel, the record belies any contention that counsel performed deficiently with respect to the challenged grounds.  Counsel moved for judgment of acquittal after the close of the government's case-in-chief.  Counsel also moved to sever prior to trial, and renewed his objection post-trial, raising a materially similar claim that Movant was denied the opportunity to present potentially exculpatory testimony from Dr. Heaton.  Movant has not shown how counsel's litigation of these issues fell below an objective standard of reasonableness.  Moreover, for the reasons discussed above, Movant's claims fail on the merits and he has not shown prejudice.  See Bolender v. Singletary, 16 F.3d 1547, 1573 (11th Cir. 1994) ("[I]t is axiomatic that the failure to raise nonmeritorious issues does not constitute ineffective assistance.").  Grounds 1, 2, and 4 of the § 2255 motion are due to be denied.

IV.     **CERTIFICATE OF APPEALABILITY**

Pursuant to Rule 11(a) of the Rules Governing Section 2255 Proceedings, "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. . . . If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." Section 2253(c)(2) states that a certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." A substantial showing of the denial of a constitutional right "includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the [motion to vacate] should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Slack v. McDaniel, 529 U.S. 473, 484 (2000) (internal quotation marks omitted). Because reasonable jurists would not debate the resolution of Movant's Grounds 1, 2, and 4, and Movant's proposed amended ground, **IT IS FURTHER RECOMMENDED** that a COA be **DENIED** as to these grounds. See id. If the District Judge adopts this recommendation and denies a COA, Movant is advised that he "may not appeal the denial but may seek a certificate from the court of appeals under Federal Rule of Appellate Procedure 22." 28 U.S.C. foll. § 2255, Rule 11(a).

V.     **CONCLUSION**

For the reasons stated above, the motion "to allow … an additional argument to [the] 28 U.S.C. § 2255 motion" [250] is **DENIED** because the proposed amended claim is untimely and procedurally barred.

**IT IS RECOMMENDED** that the § 2255 motion be **DENIED IN PART** as to Grounds 1, 2, and 4, and that no certificate of appealability issue.

The government is **DIRECTED** to file a supplemental response to Ground 3 of Movant's § 2255 motion within **TWENTY-ONE (21) DAYS** of the date of this Order.  The government must confer with Attorney Sadow and state on the record whether counsel disputes Movant's claim that he failed to consult with him about his appellate rights.   The government may submit an affidavit or declaration from Attorney Sadow demonstrating whether there is a genuine factual dispute requiring an evidentiary hearing.

**SO ORDERED AND RECOMMENDED**, this <u>18th</u> day of <u>August</u>, 2023.


<u>/s/ J. Clay Fuller</u>
J. Clay Fuller
United States Magistrate Judge